**L.S.S. LEASING CORP.; Corona Taxpayers Civic Association, Inc.; Parent Teachers Association of P.S. 14; American Legion Post 298; Sherwood Village Cooperative A, Inc.; Sherwood Village Cooperative B, Inc.; Sherwood Village Cooperative C, Inc.; Sherwood Village Cooperative D, Inc.; 6 Brothers Restaurant & Pizza, Inc.; Quality Donuts, Inc.; 58-01 Junction Food Corp.; Halkios Restaurant Corporation; Norma Cirino; and Donald Mallozzi, Plaintiffs,**

v.

**UNITED STATES GENERAL SERVICES ADMINISTRATION; Gerald P. Carmen, as Administrator of the General Services Administration; William J. Diamond, as Regional Administrator, Region 2 of the General Services Administration; United States Social Security Administration; Martha McSteen, as Acting Commissioner of the Social Security Administration; Peter P. DiSturco, as Regional Commissioner, Region 2 of the Social Security Administration; United States Department of Health and Human Services: Margaret M. Heckler, as Secretary of the United States Department of Health and Human Services, Defendants.**

No. 83 Civ. 6952 (GLG).

United States District Court, S.D. New York.

Feb. 16, 1984.

---

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, Frederick A.O. Schwarz, Jr., Corp. Counsel for the City of New York by Patricia R. Kruger, Asst. Corp. Counsel, for defendants; Kathleen A. Roberts, Asst. U.S. Atty., New York City, of counsel.

Berle, Butzel, Kass & Case, New York City, for plaintiffs; Stephen L. Kass, Robert S. Davis, Carol A. Buckler, New York City, of counsel.

## OPINION

GOETTEL, District Judge.

At issue in this case is the Queens Federal Building now under construction in Jamaica, New York, and whether the federal government has complied with the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* (1976), and with its own administrative procedures as outlined in the Public Buildings Act of 1959 ("PBA"), 40 U.S.C. § 606 (1976). Before the Court is a motion in which the plaintiffs seek a preliminary injunction barring the defendants from proceeding with the planning and construction of the building pending a final determination of their suit. For the reasons discussed below, the plaintiffs' request for a preliminary injunction is denied.

## BACKGROUND

In 1978, Congress directed defendant General Services Administration ("GSA") to study the need for a new federal office building in Queens. The building would house the offices of the approximately 2,500 employees of the Social Security Administration's Northeastern Program Center (the "Center") which was then located in four separate buildings, two of which are owned by plaintiff L.S.S. Leasing Corp. ("L.S.S."), and leased to the government. The subsequent GSA study found that because of the fragmented office space the Center was not operating as efficiently as it could operate if it were located in one building. The GSA also determined that a single location was required for the efficient use of the kind of sophisticated systems and electronic equipment that had improved efficiency at other Program Centers. As a result, the GSA recommended the construction of a new building, to be known as the Queens Federal Building.

The site selected for the building was in that section of Queens known as Jamaica. The construction of the Queens Federal Building would become a part of the Jamaica Center Development Plan, a master plan for the revitalization of that economically depressed area. In addition to the Queens Federal Building, the master plan called for the construction of a new facility for York College, the Queens County Civil Court, the Jamaica Arts Center, two million square feet of other office space, two subway stations (one adjacent to the building at issue in this case), and parking garages.

In 1980, the Senate and House Public Works Committees approved the new building and the GSA held the required public hearings which were a part of the process by which the environmental impact statement ("EIS") for the building was drawn up. L.S.S. actively opposed the new building before the Congressional committees and at the public hearings held by the GSA. In 1981, a Final Environmental Impact Statement ("FEIS") was filed and a copy was sent to L.S.S.

Once the FEIS was issued, the GSA went ahead with the project, awarding a $3 million design contract, purchasing the site for $750,000, and awarding a $60 million construction contract. Excavation at the site has already started, and some $500,000 has been spent. The total cost of the project is nearly $93 million and it is expected to be completed in August 1986.

In addition to L.S.S., the present landlord, the plaintiffs include three civic organizations,[1] four neighborhood cooperative apartment corporations,[2] two individual homeowners,[3] and four neighborhood businesses.[4] The plaintiffs contend that a preliminary injunction is appropriate because they would suffer irreparable harm if work on the project was allowed to continue and because they have demonstrated a substantial probability of success on the merits of their substantive claims that the defendants have violated NEPA, PBA and Executive Order 12411, which requires federal agencies to reduce the amount of workspace per employee. The plaintiffs also contend that they have raised serious questions that merit litigation and that the balance of hardships tips decidedly in their favor. Each of the plaintiffs' contentions will be taken up in detail in the discussion that follows.

DISCUSSION

■ It is well-established that before a preliminary injunction can be issued, the movant must clearly show (1) irreparable harm *and* (2) either a likelihood of success on the merits *or* sufficiently serious questions going to the merits *and* a balance of hardships tipping decidedly toward the moving party. *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983); *Union Carbide Agricultural Products Co. v. Costle*, 632 F.2d 1014, 1017 (2d Cir.1980), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981); *Caulfield v. Board of Education*, 583 F.2d 605, 610 (2d Cir.1978); *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358 (2d Cir.1976); *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir.1973); *Chelsea Neighborhood Association v. United States Postal Service*, 389 F.Supp. 1171, 1185 (S.D.N.Y.), *aff'd*, 516 F.2d 378 (2d Cir.1975).

■ In addition to these tests, where the public interest is involved, "more than a 'fair ground for litigation' must be shown before the action will be stopped in its tracks by court order." *Union Carbide*, *supra*, 632 F.2d at 1018. "[W]here the grant of interim relief may adversely affect the public interest in a manner which cannot be compensated for by an injunction bond, plaintiffs undertake an even greater burden of persuasion." *Medical Society of New York v. Toia*, 560 F.2d 535, 538 (2d Cir.1977) (citing *Yakus v. United States*,

1. They are the Corona Taxpayers Civic Association, Inc., a not-for-profit corporation with 125 dues-paying members; the Parent Teachers Association of P.S. 14, which has about 400 members; and American Legion Post No. 298. These groups claim that they will be injured because the neighborhood, and the services available in it, will decline due to the departure of the federal employees. The claim of neighborhood deterioration is unsupported by anything more than the conclusory statements of the plaintiffs.

2. The four cooperative corporations are Sherwood Village Cooperatives A, B, C, and D, Inc. The cooperatives, consisting of 648 apartments, are located three blocks from the buildings from which the federal employees will be withdrawn. The corporations, and their members, claim that they will be injured by the deterioration of neighborhood property values and the loss of services of those merchants who will be forced to close businesses that depend heavily on the patronage of the federal employees.

3. The individual homeowners are Norma Cirino and Donald Mallozzi, who, in addition to the claims made by the other plaintiffs, also claim that they will be injured as taxpayers by the allegedly unlawful expenditure of public funds on the Queens Federal Building.

4. These plaintiffs, all of whom are located within three blocks of the buildings from which the federal employees will be moved, are: Halkios Restaurant Corp.; 6 Brothers Restaurant & Pizza, Inc.; Quality Donuts, Inc.; and 58–01 Junction Food Corp. (Pioneer Supermarket). Quality Donuts, which does 25% of its business with the federal employees, and Pioneer Supermarket, which purports to do better than 60% of its business with the federal employees, both claim that they would be forced to close if the federal employees left the area.

321 U.S. 414, 440–41, 64 S.Ct. 660, 674–75, 88 L.Ed. 834 (1944)).

■ There is little doubt that the Queens Federal Building is a project affecting the public interest. First, because an estimated $4.5 million of the $93 million cost of the building has already been spent, the value of that expenditure would be diluted or lost entirely if the project was stopped. Second, the government estimates that it would cost approximately $166,000 to stop and restart work at the site and that the cost of the project would increase by $19,000 per day for each day that work was halted. Third, stopping the project would also affect the development of Jamaica Center, of which the Queens Federal Building is an important part.[5] Given all these considerations, it appears that the public nature of the project requires the plaintiff to show (1) the possibility of irreparable harm, *and* (2) the more stringent test of likelihood of success on the merits. *Union Carbide, supra,* 632 F.2d at 1018; *Toia, supra,* 560 F.2d at 538.

### A. *The Possibility of Irreparable Harm*

■ The plaintiffs have failed to show that unless the project is immediately stopped they will be irreparably harmed. The Queens Federal Building is scheduled for completion in mid-1986, which is some two-and-a-half years distant, even assuming that there are no construction delays. Two-and-a-half years is more than enough time for the parties to litigate the issues presented in this action and for landlord L.S.S. to line up new tenants for the space the government plans to vacate. Once L.S.S. re-leases the space, the complaints of the other plaintiffs should also be resolved.

The plaintiffs rely on *Chelsea,* in support of their proposition that a preliminary injunction should be granted. *Chelsea,* however, is clearly inapposite because the garage at issue there was to be built within the neighborhood whose residents were challenging it and the "letting of a contract for construction [was] imminent." *Chelsea, supra,* 389 F.Supp. at 1186. The impact on the plaintiffs in *Chelsea* would have been direct and immediate. Once construction started, it would have been very hard to stop. Here, the situation is very different: construction of the Queens Federal Building would affect the plaintiffs indirectly—plaintiff L.S.S. would still have its buildings to lease to others, and plaintiff homeowners, civic associations and business people would still have, respectively, a healthy neighborhood, stable home values, and office workers with whom to do business.

The plaintiffs also rely on *Rochester v. United States Postal Service,* 541 F.2d 967 (2d Cir.1976), to support their claim that a preliminary injunction should issue. However, they fail to note that while the Second Circuit did indeed reverse the district court's dismissal of the city's suit, it nevertheless declined to enjoin construction of the mail facility being challenged. The court only ordered that a new EIS be prepared to account for the effect that a transfer of postal employees would have on the downtown area and issued an injunction prohibiting the transfer of the employees pending completion of the EIS. Even if the Court ignores that major point, it finds, in *Rochester,* a case very different from the instant action.

In *Rochester,* the plaintiffs were a city and a regional planning board suing on behalf of all of the citizens of that city and the surrounding region; here the plaintiffs are local residents seeking to challenge a decision which apparently has the support of all local political leaders. In *Rochester,* the city was attempting to stave off further decay of a depressed area by preventing the departure of the post office; here, there is no evidence before the Court, other than the bald assertions of the plaintiffs, that the Corona-Elmhurst-Rego Park area

---

**5.** That there is an important public interest in the Queens Federal Building and its role in the Jamaica redevelopment plan is indicated also by the City of New York having intervened as a party defendant, its affidavit in opposition to the preliminary injunction, and its appearance at oral argument to oppose the plaintiffs' motion.

would be hurt by the plan to move the federal employees to Jamaica. Finally, in *Rochester*, there was evidence that some current post office employees might be forced out of work because they could not afford to commute to the new location; another factor missing here.

As a consequence, the plaintiffs are left with neither the facts nor the legal authority that they need to support their claim that they will suffer irreparable harm if a preliminary injunction is not granted.

B. *Likelihood of Success on the Merits*

The plaintiffs contend that they are likely to succeed on their claims that the FEIS is deficient; that a supplementary EIS is now needed; that the defendants violated Executive Order 12411; and that the defendants violated the PBA. Each of these claims will be analyzed in turn.

### 1. *The FEIS*

The plaintiffs claim that the FEIS is deficient in three ways: first, because it fails to discuss in detail the impact of the Queens Federal Building on the Corona-Elmhurst-Rego Park area from which the federal employees will be withdrawn; second, because it fails to discuss alternatives to a new building (most notably an offer by L.S.S. to remodel and enlarge the two buildings it now leases to the government); and third, because it fails to discuss the impact of the new building on the Jamaica area (including such factors as transportation, solid waste disposal, water supply, nearby historic structures, and toxic wastes).

■ The purpose of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* (1976), which requires, *inter alia,* the preparation of an EIS, "is to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decision-making agency." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). When a governmental agency

makes a decision, the only function for the courts is to make certain that the agency has considered the environmental impacts and that it had complied with the procedural requirements of NEPA, not to inject itself into the decision-making process that is properly the responsibility of the Executive Branch. *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980).

■ In order to meet the goals of NEPA, an EIS must provide sufficient information to allow the decisionmaker to make a fully informed decision that balances the risks of harm to the environment against the benefits to be gained from the project under consideration. The purpose of the EIS is to make sure that "stubborn problems or serious criticisms have not been 'swept under the rug.'" *Sierra Club v. United States Army Corps of Engineers,* 701 F.2d 1011, 1029 (2d Cir.1983). *See also Rochester, supra,* 541 F.2d at 975; *Minnesota Public Interest Research Group v. Butz,* 541 F.2d 1292, 1299 (8th Cir.1976), *cert. denied,* 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977); *Chelsea, supra,* 516 F.2d at 386–87; *Sierra Club v. Morton,* 510 F.2d 813, 821 (5th Cir.1975); *Action for Rational Transit v. West Side Highway Project,* 536 F.Supp. 1225 (S.D.N.Y.1982), *aff'd,* 699 F.2d 614 (2d Cir.1983).

Where the courts have found that the EIS has totally failed to raise an issue of major environmental concern, or where the environmental issue was dealt with in such a perfunctory or sketchy manner that an informed decision could not be made based on the contents of the report, the courts have rejected the EIS as inadequate. But where the EIS has discussed an issue in an adequate manner, the court has not rejected it, even though discussion of the issue was not exhaustive.

Thus, in *Sierra Club v. United States Army Corps of Engineers, supra,* 701 F.2d at 1031, the Second Circuit affirmed the district court's finding that there was insufficient information in the FEIS and

that the conclusions lacked a "substantial basis in fact." *Id.* In *Rochester, supra,* 541 F.2d at 973, the court likewise rejected an FEIS on the grounds that it failed to discuss the impact of the transfer of 1,700 employees in terms of any increase in both traffic and employee commuting costs that would result therefrom. In *Chelsea, supra,* 516 F.2d at 389, the FEIS was rejected for failing to adequately disclose and consider that part of the project might never be constructed. In *Action for Rational Transit, supra,* 536 F.Supp. at 1253, an FEIS was rejected for failure to adequately discuss the effect of a landfill on a breeding area for striped bass. Judge Griesa held that the government "had no right to swallow up these issues in the privacy of its bosom." *Id.*

The standard for court review of an FEIS, in light of these cases, is that the document will be considered adequate if it clearly discloses all of the major environmental concerns and addresses them in an appropriate and forthright manner. Applying this standard to the FEIS in the instant case, the Court finds the following:

(a) There is no merit to the plaintiffs' claim that the negative impact of the withdrawal of the 2,500 employees from the Corona-Elmhurst-Rego Park area was not adequately discussed. In point of fact, the FEIS takes note of the negative impact on the area and includes a statement that the GSA has been directed to give priority to replacing those employees with an equal number of other government employees. The FEIS also notes that the New York City Planning Commission has offered to help fill the space being vacated.

The absence of further discussion of the impact on the neighborhood being abandoned is not significant enough to result in the FEIS being set aside. As noted above, the purpose of the FEIS is to assure that all of the major environmental questions are fully and publicly aired. The GSA has done that here, weighing the potential harm to the Corona area against the benefits of constructing a modern and efficient facility *and* the contribution that facility would make to rehabilitating the depressed Jamaica area, and has opted to construct the new building. There is ample evidence in the record and in the FEIS that virtually every local political leader has endorsed the Jamaica Center plan and the new building. Having lost their battle in the political arena, the plaintiffs cannot expect the Court to aid their attempt to overturn a decision that was properly made by the Executive Branch. Furthermore, the plaintiffs' claims that the departure of the federal employees will create instant blight in the Corona area is unsupported in the record by anything other than the plaintiffs' own conclusory statements.

(b) There is no merit to the plaintiffs' claim that the FEIS discussion of alternatives to the new building is inadequate. In point of fact, the FEIS does discuss a number of alternatives to the new building, including a full page on the pros and cons of remodeling and expanding the current buildings. The conclusion reached in the FEIS, however, is that the configuration of those buildings is inadequate for the needs of the Center and that remodeling during occupancy would seriously disrupt its operations. The Court sees no reasons to overturn that finding.

(c) Finally, the Court finds that there is no merit to the plaintiffs' claim that the FEIS does not discuss with sufficient care the impact of the new building on Jamaica.[6] In point of fact, the bulk of the report addresses the impact of the new building on the Jamaica area and finds that the balance of environmental impacts is clearly on the positive side. The plaintiffs also complain that the FEIS is inadequate be-

---

**6.** The question of whether the residents of the Corona-Elmhurst-Rego Park area have standing to challenge alleged defects in the FEIS as it applies to the Jamaica area was not adequately addressed in the briefs or at oral argument. It must be noted, however, that, since none of the plaintiffs live in Jamaica, it appears unlikely that they would suffer any injury as a result of environmental damage to Jamaica, so they probably have no standing to challenge those alleged FEIS deficiencies.

cause it fails to adequately discuss the impact of the new building on local transportation, solid waste disposal, water supply, historic structures, and toxic wastes. Having examined the FEIS, the Court finds as follows:

Transportation—The FEIS indicates that the new building will be within walking distance of the Jamaica station of the Long Island Rail Road; that it will be served by a new subway spur that is currently more than half completed; and that 37 different bus routes stop within a two-block radius of the new building. The FEIS also notes that, while streets in Jamaica are congested, a plan to reroute the flow of traffic should improve circulation. The FEIS also notes that only 500 of the 2,500 employees involved in the move currently drive to work and that Jamaica now has some 6,000 off-street parking spaces, with more planned as additional buildings are added to the area.

Solid Waste Disposal—The plaintiffs claim that the dump site that is scheduled to receive waste from the Queens Federal Building will be filled by 1986 when the building opens and that the FEIS inadequately addresses this point. The plaintiffs, however, disingenuously omit to mention that solid wastes from the current Center are now being disposed of at the same landfill as will be the wastes from the new building.[7]

Water Supply—The plaintiffs complain that the FEIS does not sufficiently address the problem of water supply in the area. The FEIS does, however, note that the area is served by a private water utility that has always had an adequate supply of water. Indeed, during previous drought periods, the utility was able to sell excess water to the city.

Historic Structures—The new building is located across the street from the Grace Episcopal Church, a city landmark, and next to the former Dutch Reformed Church, which is in the National Register of Historic Places. The plaintiffs complain that the FEIS does not adequately address how these structures will be protected. In point of fact, the FEIS contains both the GSA's pledge that it will conform with the requirements of the National Historic Preservation Act of 1966, 16 U.S.C. § 470, *et seq.* (1982), and a letter from the Rector of the Grace Episcopal Church supporting construction of the new building. The pledge and the letter of support constitute more than sufficient assurance that the old buildings will be appropriately preserved.

Toxic Wastes—The plaintiffs claim that there is the "possibility" of toxic wastes being released by excavation at the site of the new building. This contention is based on the plaintiffs' speculation that toxic wastes "may" have been created by a former gas production facility some 400 feet south of the construction site and that the wastes "may" have migrated to the site. Aside from this curious and elliptical reference, the plaintiffs' papers provide no support for their contention that this highly speculative hazard, if it exists at all, is of a nature sufficiently significant to warrant its analysis in an FEIS. As indicated above, an FEIS need not discuss every possible environmental impact, only those that are of a sufficiently serious nature that they would, or should, influence the decision-making process.

■ In sum, it appears that the issues raised here were either adequately discussed in the FEIS or should have been raised during the comment period following publication of the draft EIS, of which the plaintiffs were well aware. That they raise these issues now "carries the flavor of a litigation afterthought." *East 63rd Street*

---

7. The defendants properly note that, if the landfill in question is filled to capacity, it will not be because of the relocation of its employees. Furthermore, the government notes that garbage disposal is properly a function of New York City and appropriately expresses its confidence that the city will be able to accommodate the disposal of wastes not only from the Queens Federal Building, but from the entire Jamaica area. Additionally, the FEIS notes that waste paper from the new building will be recycled.

*Association v. Coleman*, 414 F.Supp. 1318, 1328 (S.D.N.Y.1976).[8]

## 2. Supplemental EIS

The plaintiffs claim that, according to regulations adopted by the Council on Environmental Quality, a supplemental EIS must be drawn up. The regulations to which the plaintiffs refer state that a supplemental EIS must be drafted whenever there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c) (1982). The "new developments" that the plaintiffs cite are (1) a surplus of federal office space in the New York area, and (2) Executive Order 12411, 48 Fed.Reg. 45,105 (1983), which, in conjunction with GSA regulations promulgated thereunder, requires federal agencies to reduce the amount of work space per employee to 135 square feet.

The mere fact that there has been some change in the circumstances surrounding a project is not, in itself, enough to require that a supplemental EIS be drawn. As the Supreme Court noted, there is always a gap between the time a record is closed and the time administrative action is taken. If, each time some new development takes place, a litigant may demand review, " 'there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening.' " *Vermont Yankee Nuclear, supra,* 435 U.S. at 555, 98 S.Ct. at

**8.** Indeed, it should be noted that the defendants have raised what appears to be a meritorious laches defense.

The doctrine of laches is applicable in environmental suits in which injunctive relief is sought. But, before it may be invoked, the defendants must make a three-part showing that: (1) the plaintiffs delayed in asserting their claims; (2) the delay was not excusable; and (3) the defendants would suffer undue prejudice if the plaintiffs were allowed to press their delayed claims. *Ecology Center of Louisiana v. Coleman,* 515 F.2d 860, 867 (5th Cir.1975); *East 63rd Street Association v. Coleman,* 414 F.Supp. 1318, 1329 (S.D.N.Y.1976); *Dalsis v. Hills,* 424 F.Supp. 784, 788 (W.D.N.Y.1976).

There appears to be little doubt that the plaintiffs did indeed delay in bringing their suit and that the delay was without excuse. The plaintiffs were deeply involved in fighting the Congressional budget allocation for the Queens Federal Building and participated in the process which led to the publication of the FEIS. The FEIS was published in July 1981; a design contract was awarded in December 1981; and the site was purchased in April 1982. The suit was not filed until October 1983, a gap of three years from the date the FEIS was issued. The plaintiffs' only response to all this is that there are too many uncertainties between the issuance of an FEIS and the start of construction, a response that is hardly adequate, especially in view of the position and influence of the lead plaintiff, L.S.S., which is a part of one of the most influential real estate concerns in New York. (The president of L.S.S. is also president of the Lefrak Organization.) The plaintiffs also contend that "positive developments [such as the start of construction] are usually required to galvanize opposition to a project," *Steubing v. Brinegar,* 511 F.2d 489, 495 (2nd Cir.1975), and for this reason their delay in bringing the suit should be excused. Given the position, power and experience of the lead plaintiff and its law firm, which has extensive experience in environmental litigation, such a claim rings hollow indeed.

The plaintiffs also fail the third prong of the test that must be passed before a defense of laches will be allowed—undue prejudice to the defendant. Here, approximately 5% of the total $93 million budget for the new building has been spent and might be wasted if construction were forced to stop. Furthermore, as discussed, there are the additional shut-down and start-up costs that would be incurred if the project were forced to stop. There is also the question of the public interest in providing the Northeastern Program Center with a new and efficient facility and in helping redevelop the economically depressed Jamaica area.

For all of these reasons, it appears that the defendants would be unduly prejudiced by granting the plaintiffs' motion for a preliminary injunction.

The defendants also claim that the laundry list of objections to the FEIS should properly have been raised during the administrative phase of the proceedings and that the failure to raise them then, bars the plaintiffs from raising them now. If these alleged omissions are indeed significant, as the plaintiffs contend, they should certainly have been raised during the administrative process. *See East 63rd Street Association, supra,* 414 F.Supp. at 1325. If the alleged omissions are not significant, then they need not be discussed in the FEIS, as noted above.

1217 (quoting *ICC v. Jersey City*, 322 U.S. 503, 514, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420 (1944)). Whether a supplemental EIS is necessary "must remain the responsibility of the agency [making the decision]." *Sierra Club v. United States Army Corps of Engineers, supra*, 701 F.2d at 1037. As long as there is no bad faith in making that decision, the courts should not intervene and order a supplemental study. *Id.*

On the record before this Court we have only the plaintiffs' unsupported assertion that there is a surplus of federal office space in the New York area. Even assuming that this is true, the plaintiffs fail to show that whatever surplus space exists can be efficiently and economically used for the purpose for which the Center needs space. In fact, the FEIS indicates that there is no space of the size and configuration needed by the Center. The record also indicates that the GSA very carefully searched for such space and failed to find it. The record further shows that, during August 1983, work on the planning of the new building stopped while the GSA reevaluated the need for the new building. Based on the consideration that the efficient operation of the Center required specially designed and constructed space, the decision to proceed with the building was approved.

 In sum, the plaintiffs make no showing of bad faith on the part of the GSA in making its decision not to draft a supplemental EIS. The plaintiffs rely only on their own unsupported allegations that there is a surplus of federal office space in the New York area. These allegations do not provide a sufficient basis for this Court to order a supplemental EIS. Furthermore, even if the claims were more substantial, the Court would still be sympathetic to the argument that the GSA's reconsideration of the project obviated the need for a supplemental EIS.

### 3. *Violation of the Executive Order*

The plaintiffs put forth two arguments to support their claim that the transfer of federal employees will result in a violation of Executive Order 12411.[9] First, they contend that, due to the limitation of 135 square feet of space per employee, there is the reduced likelihood that the federal government will be able to move other employees into the space that will be vacated. This contention is speculative at best. Not only is there no proof that the government will have to remain the tenant of all the space it now occupies (or of other existing federal buildings in New York City) but the plaintiffs have presented no evidence to support their general claim that federal buildings are underutilized.

Second, the plaintiffs contend that the one million square feet of space in the Queens Federal Building, which will house up to 3,400 employees, violates the order because there will be nearly 300 square feet of space per employee. This argument must also fail. The plaintiffs have simply divided the total square footage of the new building by the number of employees, to arrive at their figure. They have neglected to deduct from the total available space that which must be used for storage of files and housing computers and other equipment—space that cannot physically be occupied by federal employees no matter how economy-conscious the government tries to be. The plaintiffs also fail to take note that Executive Order 12411 recognizes that there may be circumstances, of which this might be one, in which agencies must be excused from the work space restrictions in the order.

### 4. *Violations of the Public Buildings Act*

The plaintiffs claim that the Public Buildings Act of 1959 has been violated because, they contend, both the Senate and House Public Works Committees inserted into the authorization for the new building, a provi-

---

**9.** The defendants also raise the issue that the plaintiffs' challenge to the Queens Federal Building will not lie because there is no private cause of action under an Executive Order. We need not reach this issue.

sion requiring that the existing buildings, from which the federal employees will be transferred, be given priority consideration when the federal government seeks additional space for its other agencies. This contention must fail for several reasons: first, since the House Public Works Committee failed to pass that provision, it is of doubtful legal force; second, such a promise of priority cannot be treated as an absolute obligation to replace the departing employees; and third, any obligation the government may owe L.S.S. will not arise until the employees currently working in those buildings depart for the new buildings—an event that will not occur for more than two years, as has been previously noted.

## C. *Balance of Hardships Tipping Toward Movant*

As indicated above, because of the public interest nature of this project, the plaintiffs must meet the more difficult test of showing the likelihood of success on the merits before a preliminary injunction will issue. But even assuming that they were subject only to the less rigorous test of showing sufficiently serious questions going to the merits *and* a balance of hardships tipping decidedly in favor of the moving party, the plaintiffs' motion would still fail to meet the test. The plaintiffs claim that if the Queens Federal Building is completed and the federal employees are withdrawn from the existing buildings, the entire Corona-Elmhurst-Rego Park area will suffer a severe blow. This, they allege, would lead to the decline and decay of the neighborhood, and a deterioration of the plaintiffs' lifestyles, businesses, and property values.

On the other side, the government notes that it has spent nearly $5 million on this project and would incur $160,000 in shutdown and start-up costs and cost increases of over $19,000 per day for each day that construction is delayed.

In weighing these two claims, the Court notes that the government's claims are clearly and precisely stated, while the plain-

tiffs' are not. There is no evidence before the Court to support the plaintiffs' contentions that, when the federal employees are withdrawn from the area, the entire neighborhood will suddenly deteriorate. On the contrary, the plaintiffs have been given more than three years' notice to allow them to plan for the replacement of the federal workers. While most of the plaintiffs are small businessmen and homeowners without the resources to plan for the removal of the federal employees, the Court cannot overlook the fact that the lead plaintiff is L.S.S. Leasing Corp., which, in addition to the buildings from which the federal employees will be withdrawn, also owns substantial other properties in the neighborhood. Furthermore, Richard LeFrak, president of L.S.S., is also president of the Lefrak Organization ("Lefrak"), which owns Lefrak City, a 5,000-unit apartment development adjoining the two L.S.S. buildings from which the federal employees will be removed. Lefrak is a major force in New York real estate and the Court finds it hard to believe that Lefrak is without the resources to find other tenants, whether private or governmental, to replace the departing federal employees. The Court also notes that New York City's Planning Commission has offered to help plaintiff L.S.S. replace the federal employees with state and municipal employees and that L.S.S. has failed to respond to that offer of help.

For these reasons, the Court finds that the plaintiffs have failed to show that the burden of hardships tips decidedly in their favor and so have failed to meet this third prong of the test for a preliminary injunction.

## CONCLUSION

The plaintiffs' request for a preliminary injunction raises serious socio-political questions. If the plaintiffs were allowed to prevail here, they would be able to win in the courts a battle that they had lost in the political arena. The record before the Court clearly shows that the plaintiffs had a more than adequate opportunity to lay

**1576**

their claims and concerns before their elected representatives on the national, state and local levels, and that they had ample opportunity to participate in the process that led to the publication of the FEIS. Once a governmental decision has been made in good faith and in compliance with the law, the plaintiffs must learn to accept it in good grace and adjust accordingly, not to seek remedies in the courts on what are, for the most part, frivolous grounds.[10]

If the plaintiffs were allowed to prevail on the claims they bring here, they would, for all intents and purposes, freeze the government in its current position and make it very nearly impossible for the government to relocate employees to meet changing goals and needs. Even more serious, the government would become, in effect, an "insurer" for all landlords from whom it currently rents space, guarantying them that they will never again have to expend effort to locate new tenants because the government would never be allowed to leave rented premises due to the "harmful environmental impact" of the departure of a large block of federal employees. The Court does not believe that this was the purpose of the environmental regulations.

For the foregoing reasons, the plaintiffs' motion for a preliminary injunction is denied.

SO ORDERED.

---

**10.** The Court is particularly disturbed by the misleadingly incomplete representations concerning the adequacy of the landfill that will receive waste from the new building and the possibility of a toxic waste site somewhere near the new facility.