UNITED STATES of America, Plaintiff,

v.

27.09 ACRES OF LAND, MORE OR LESS, SITUATED IN THE TOWN OF HARRISON AND THE TOWN OF NORTH CASTLE, COUNTY OF WESTCHESTER, STATE OF NEW YORK, the County of Westchester, and Unknown Others, Defendants,

and

Purchase Environment Protective Association, Inc., and Town of Harrison, Defendants–Intervenors.

The CITY OF NEW YORK, Plaintiff,

v.

The UNITED STATES POSTAL SERVICE and Anthony Frank, as Acting Postmaster General of the United States, Defendants.

Nos. 88 Civ. 1805 (MEL), 91 Civ. 0758 (MEL).

United States District Court, S.D. New York.

March 28, 1991.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City (Diana J. Hassel, Paul K. Milmed, Asst. U.S. Attys., of counsel), for U.S., U.S. Postal Service and Anthony Frank.

Marilyn J. Slaatten, Westchester Co. Atty., White Plains, N.Y. (John Dillon, Susan B. Owens, Asst. Co. Attys., of counsel), for County of Westchester.

Daniel Piloseno, Town Atty., Leslie J. Snyder, Deputy Town Atty., Harrison, N.Y., for Town of Harrison and Village of Harrison.

Davis, Polk & Wardwell, New York City (Robert F. Wise, Jr., of counsel), for Purchase Environmental Protective Ass'n, Inc.

Victor A. Kovner, Corp. Counsel of City of New York, New York City (Peter H. Lehner, Asst. Corp. Counsel, Environmental Prosecution Unit, and Susan E. Amron, of counsel), for City of New York.

LASKER, District Judge.

The United States brought the principal suit on behalf of the United States Postal Service (the "Postal Service" or the "Service") to condemn land for the construction of a new General Mail Facility and Vehicle Maintenance Facility ("GMF/VMF" or "facility") to serve all of Westchester and Putnam Counties, New York.[1]

The City of New York (the "City") filed a separate suit for declaratory and injunctive relief in *City of New York v. United States Postal Service*, 91 Civ. 0758 (MEL). Westchester County and the Purchase Environmental Protective Association ("PEPA"), now joined by the Town of Harrison, and the City all move for a preliminary injunction barring construction of the postal facility pending completion of an Environmental Impact Statement ("EIS").[2] The United States moves for partial summary judgment on the issues raised by the motions for a preliminary injunction.

The proposed facility will require the paving of at least six acres of currently undeveloped land and will require the erection of two large buildings totalling roughly 873,000 square feet. The land is adjacent to the Westchester County Airport and therefore is extremely desirable to the Postal Service; it also includes wetlands and is within 700 feet of the Kensico Reservoir (the "Reservoir"), through which ninety percent of New York City's drinking water passes. These circumstances make critical the evaluation and management of the project's possible environmental consequences.

The motions put in issue the Postal Service's finding that its proposed facility will have no significant impact on the environment, and that accordingly no full EIS need be prepared before its construction pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* (1988).

For the reasons discussed below, the motions for a preliminary injunction are granted, and the United States' motion for summary judgment is denied.

I.

For several years the Postal Service has engaged in planning to replace its current Westchester County, New York General Mail Facility and Vehicle Maintenance Facility, which it characterizes as "outmoded and inadequate." Review of a variety of possible locations led to the selection of the site now at issue, in the Towns of Harrison and North Castle, adjacent to the Westchester County Airport and Route 120, and very near Interstate Highway 684 ("I-684").

The proposed facility includes a multistory General Mail Facility ("GMF") and a one-floor Vehicle Maintenance Facility ("VMF"), both intended to serve all of Westchester County. The site will include more than six acres of paved surfaces and over 873,000 square feet of building space. The facility is expected to operate 24 hours a day seven days a week, to generate 500 to 700 official vehicle trips and additional private vehicle trips each day, and to employ over 1,600 workers.

The Service initially selected the present site in February 1988, and that month published an Environmental Assessment ("EA") concluding that a full EIS ("EIS") was unnecessary because "significant environmental impacts are not anticipated which cannot be mitigated." On February 18, 1988, the EA was supplemented by a "Wetland Impact Report" identifying one affected wetland of .95 acres.

On December 23, 1988, the Service issued a revised EA, again concluding that no EIS was necessary.

---

**1.** An earlier decision in the case is reported at 737 F.Supp. 277 (S.D.N.Y.1990).

**2.** This opinion refers collectively to all parties seeking preliminary injunction against the Postal Service as the "movants."

In the fall of 1989, Congress, responding to controversy over the site's selection, passed a bill restricting funding for work at the site until February 1, 1990, and requesting the Service to report to the House Appropriations Committee as to possible alternative sites. Congresswoman Nita Lowey then established an independent Citizens Advisory Committee on Site Selection, which on January 8, 1990 recommended three alternate sites. The Service objected to these sites and in February 1990 issued another revised EA for the Harrison site. The new EA now identified a total of 1.371 acres of wetlands on the site.

On July 15, 1990, the Town of Harrison presented the Service with an extensive list of alleged inadequacies in the most recent EA, and demanded preparation of a full EIS.

In October 1990 the Service issued a fourth EA, which was followed on November 8, 1990 by the issuance of a finding of no significant impact ("FONSI") when anticipated mitigation measures were taken into account. This EA and its appendices consist of seven volumes containing extensive discussion of many possible environmental effects of the proposed Facility. It includes discussion of the anticipated impact of the project on the Kensico Reservoir, wetland areas on the site, traffic in the area, and wastewater disposal and water supply, as well as the project's cumulative environmental impact in conjunction with other nearby land uses.

Movants allege that the Service was arbitrary and capricious in declaring the project not likely to have a significant impact and failing to complete an EIS, and that the Service therefore has violated the requirements of NEPA and regulations pursuant to that statute. NEPA requires federal agencies to prepare an EIS before embarking on "major Federal actions significantly affecting the human environment." 42 U.S.C. § 4332(2)(C). Regulations pursuant to NEPA authorize agencies to conduct a preliminary environmental assessment ("EA") to determine whether a project is likely to have significant environ-

mental effects, and accordingly whether a full EIS must be prepared. 40 C.F.R. § 1508.9(a)(1) (1990).

Movants allege that the present EA relies on several mistaken factual premises, that it neglects to consider other relevant factors, and more broadly that it is the result of the Postal Service's effort to justify a preordained result rather than to consider objectively the environmental consequences of the proposed action and its alternatives. Review of the record confirms the existence of a variety of shortcomings in the Service's EA, including that:

1) The EA's analysis of the facility's cumulative impacts failed to consider the compounding effects of present and anticipated future development in the area.

2) The EA's traffic analysis relies on the implementation of mitigation measures including the installation of new traffic signals and the expansion of existing roads although these measures have not received necessary state approval, and may therefore prove impossible to implement.

3) The EA fails to consider the effects of any failures of the proposed mitigation measures. This omission is especially troubling because the Service's proposed mitigation of the effects of stormwater runoff, which will pass through on-site wetlands to the Kensico Reservoir, is extensive but relies on measures whose effectiveness movants have cast into serious doubt.

## II.

◼ The dispositive issue on these motions is whether, despite the extensive analysis contained in its EA, the Service was arbitrary and capricious in finding that the project would have no significant impact.

### A. *Statutory and Regulatory Framework*

Section 102 of NEPA requires a federal agency to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Because the United States concedes that the proposed facility consti-

tutes a "major federal action" within NEPA's meaning, the pending motion hinges on whether the Service has adequately supported its finding that the facility will not affect the environment significantly.

Regulations guiding federal agencies in determining whether an EIS is required call for the completion of an environmental assessment ("EA") to provide "sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1) (1990). This analysis is to "include brief discussions of the need for the proposal, [and] of alternatives." 40 C.F.R. § 1508.9(b).

In addition, Postal Service regulations require each EA to include:

1) A summary of major considerations and conclusions;

2) A description of the proposed action;

3) For each reasonable alternative, a description of the affected environment, the environmental consequences, the mitigation measures, if any, and a comparison to all alternatives considered.

39 C.F.R. § 775.7(a).

Postal Service regulations authorize the issuance of a "Finding of No Significant Impact" ("FONSI") if "there is no significant impact of a proposed action on the environment." 39 C.F.R. § 775.6(a)(2). The FONSI must "briefly present[ ] the reasons why an action will not have a significant effect on the human environment and state[ ] that an environmental impact statement will not be prepared. It must refer to the environmental assessment and any other environmentally pertinent documents related to it." *Id.*

Regulations pursuant to NEPA also elaborate on the definitions of its terminology. Particularly relevant in the instant case is the extensive definition of the "significan[ce]" of a project's effects on the environment, which the regulations indicate depends both on the context and intensity of likely effects. The regulations state:

The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment....

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical....

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27.

Finally, the Postal Service has promulgated regulations requiring the EA or EIS to provide specific information concerning projects with an impact on wetlands and floodplains, and to analyze alternatives to

the proposed development.[3] 39 C.F.R. § 776.5. If the Postal Service determines that there is no alternative to construction that would affect a wetland or floodplain, it may proceed with the project, but only after providing detailed public notice and a thirty day public comment period prior to acquiring the land. 39 C.F.R. §§ 776.5, 776.8.

## B. Standard of Review

■ The determination whether a project will have a "significant" impact in the environment is substantive and traditionally has been left to the discretion of the agency. *Orangetown v. Gorsuch*, 718 F.2d 29, 34 (2d Cir.1983), *cert. denied*, 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 124 (1984). The scope of judicial review is defined by the Administrative Procedure Act (APA), which provides for reversal of agency action only when that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Orangetown*, 718 F.2d at 35; *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971).[4] In NEPA cases, the duty of reviewing courts has been defined as "essentially procedural," and as solely "to insure that the agency has considered the environmental consequences" and that the agency has followed the correct procedures in arriving at the decision under review. *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980) (per curiam); *see also Orangetown, supra*, 718 F.2d at 35. Moreover, "[b]ecause analysis of the relevant doc-

uments 'requires a high level of expertise,' [the court] must defer to 'the informed discretion of the responsible federal agencies.'" *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377, 109 S.Ct. 1851, 1860–61, 104 L.Ed.2d 377 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976)). The Court of Appeals for this Circuit has defined the court's task to be:

> ... to ensure that [the agency] has taken a "hard look" at the environmental consequences which are likely to result from the [proposed activity], to be attuned to whether the [agency] has considered the relevant areas of environmental concerns, and to assess whether the agency has convincingly documented its determination of "no significant impact."

*Orangetown, supra*, 718 F.2d at 35.

■ In spite of these limitations on judicial review, however, obviously inadequate or bad faith analyses by an agency are not to be validated. A court can look beyond the agency's recitations that it has considered relevant facts or arguments in concluding that a project is unlikely to have a significant environmental impact. The Court of Appeals for this Circuit has noted in the context of review of an EIS that:

> If the district judge finds that the agency did not make a reasonably adequate compilation of relevant information and that the EIS sets forth statements that are materially false or inaccurate, he may properly find that the EIS does not satisfy the requirements of NEPA, in that it cannot provide the basis for an informed evaluation or a reasoned decision. Fur-

---

**3.** 39 C.F.R. § 776.5 requires the EA or EIS for projects affecting wetlands to:

(1) Document whether the proposed action will directly or indirectly support floodplain development.
(2) Document the impacts a proposed action would have on the floodplain or wetland, including positive and negative; concentrated and dispersed; short-term and long-term.
(3) Document the flood hazard and risk to lives and property.
(4) Present the natural and beneficial floodplain values.
(5) Present measures which will preserve the floodplain, minimize harm to it, or restore it.

**4.** Movants argue that a "reasonableness" standard either should be applied instead of the "arbitrary and capricious" standard or is in fact synonymous with it for purposes of judicial review pursuant to NEPA (citing dicta in *Marsh v. Oregon National Resources Council*, 490 U.S. 360, 377 n. 23, 109 S.Ct. 1851, 1861 n. 23, 104 L.Ed.2d 377 (1989)). While a number of courts have agreed with this argument, it has not been adopted unambiguously by either the Supreme Court or the Court of Appeals for this Circuit. Because its adoption here is not necessary, in this case the arbitrary and capricious standard is applied.

ther, the court may properly be skeptical as to whether an EIS's conclusions have a substantial basis in fact if the responsible agency has apparently ignored the conflicting view of other agencies having pertinent expertise.

*Sierra Club v. United States Army Corps of Engineers,* 701 F.2d 1011, 1030 (2d Cir. 1983). *See also Silva v. Lynn,* 482 F.2d 1282, 1285 (1st Cir.1973) ("comments from responsible experts or sister agencies disclos[ing] new or conflicting data or opinions ... may not simply be ignored. There must be good faith, reasoned analysis in response"); *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1383 (2d Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978) ("Where evidence presented to the preparing agency is ignored or otherwise inadequately dealt with, serious questions may arise about the author's efforts to compile a complete statement").

### C. Application of these Standards

Measured by these standards the Postal Service's promulgation of a FONSI was arbitrary and capricious. Movants have made an abundant showing that serious shortcomings exist in several aspects of the EA: in its failure to consider the facility's cumulative impact with anticipated development in the region and with existing activity beyond the site's immediate neighbors; in its reliance on traffic mitigation measures which lack state approval and may never be achieved; and in its failure to weigh the probable results of any inadequacies of its mitigation measures—inadequacies which movants have shown may well materialize should the facility as now envisioned move forward.

#### 1. Cumulative Impacts

a) The Service inadequately considers the cumulative impact on water quality which the facility will have in conjunction with other activity in the area. The EA deals solely with the interaction of expected runoff from the site with present levels of runoff from the nearby New York State Department of Transportation (NYSDOT) site and the Westchester County Airport,[5] based on its analysis of current runoff from those sites. This inquiry included no consideration of possible future development of those facilities or of other nearby land. While such an omission may be excusable where future development is unlikely or difficult to anticipate, in the present case there currently exist plans to expand the airport dramatically, and movants have identified substantial additional development in progress or being planned in the vicinity. The impact of this array of near-certain future development will in fact be felt in combination with the effects of the facility's construction and operation, and accordingly must be analyzed.

The failure of the EA to consider the facility's cumulative impact in conjunction with nearby anticipated development is a matter of particular concern in light of the regulations' clear statement that agencies should account for the impact of "reasonably foreseeable future actions." *See* 40 C.F.R. § 1508.6 (defining "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency ... or person undertakes such other actions....") *See also* 40 C.F.R. § 1508.27(b)(7) ("... Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment").

b) The Service has also framed its cumulative impact analysis too narrowly by considering only the facility's two immediate neighbors, the Westchester County Airport and the NYSDOT facility. Even if it is true that runoff from the facility will interact primarily or exclusively from those two sites before reaching the Kensico Reservoir, a critical consideration in determining

---

**5.** Movants also assert that the Service understates the danger of harm from the interaction of present runoff from neighboring installations with runoff from the facility. While their objections appear well reasoned and documented, however, the Service presents similarly forceful arguments in favor of its position. We are neither capable nor legally permitted to resolve this "battle of experts."

the facility's cumulative environmental effects must be the interaction of its runoff with other pollutants coming into the Reservoir from whatever source. While the City's proposed scope and detail of inquiry (an exhaustive canvass of current and future development throughout the 1900 square mile watershed that feeds the Reservoir) may be excessive, the Service's consideration solely of two other potential sources of contamination is inadequate in light of the relevant environmental concern, which is the overall quality of the City's drinking water.

### 2. Traffic Problems

a) The facility will engender 500 to 700 official vehicle trips each day and even more private vehicle trips to service the facility's 1600 workers. The EA acknowledges that without the implementation of extensive mitigation measures, the facility will cause traffic to back up at the exit ramp from I–684 to the Airport Access Road and at the intersection of that road and Route 120. The EA relies on the widening of Route 120 and the installation of signals and dedicated turn lanes at the above two intersections to mitigate these effects. The movants argue, and the Service acknowledges, that neither the final approval of NYSDOT nor a funding commitment from the state has been obtained for these changes. Although the Service contends that substantial approval will follow the completion of pending negotiations and that it will pay for the improvements should the state fail to do so, these propositions are too speculative to provide a secure basis for asserting that mitigation measures will eliminate any potential significant impact of the facility on traffic.

### 3. Mitigation Measures

a) The FONSI is predicated on the implementation and effectiveness of extensive mitigation measures, including the stormwater runoff management systems, the widening of roads and addition of signals and dedicated turn lanes, and the replication of a wetlands area to be displaced by the facility. Praiseworthy as the inclusion of such mitigation measures is, the necessity for their existence inevitably suggests that without such measures the facility would have a significant environmental impact. Given that reality, the EA is inadequate in its failure to consider the consequences of possible non-implementation or inadequacy of its anticipated mitigation measures. What happens if the fail-safe fails? While the Postal Service expresses confidence in the effectiveness of its safeguards, in a world in which technological failures are commonplace it is foolhardy not to consider the consequences of such failures.

b) Movants have presented at least a serious question as to several possible inadequacies in the contemplated runoff control and decontamination systems.

Among these are the possible failure of catchbasins integral to the runoff management systems due to high groundwater levels on site. The purpose of the catchbasins is to catch runoff from the site's impervious surfaces and to allow debris and contaminants to settle out of the water before it is released, either directly off the site or, in the case of runoff from areas more likely to contain high levels of contaminants, into the facility's proposed stormwater retention pond. Movants observe that the EA indicates that groundwater depth varies from 1.5 to 8.5 feet below the surface throughout the site, and that the EA indicates that the catchbasins are to be installed below that level. Thus there appears to be a risk that contaminants contained in these catchbasins will be washed into the reservoir. While the Service now maintains that the catchbasins will be installed above groundwater level, the Service has not identified a clear basis in its EA for this assertion.

Movants also contend that neither proposed oil-water separators nor any other proposed mitigation measure will remove certain pollutants likely to be found in runoff from the site, including salts, solvents, antifreeze, detergents and hydrocarbons, and that these pollutants will pass into the Kensico Reservoir. The Service acknowledges that certain contaminants will not be

filtered out of stormwater before it is released into wetlands and the Reservoir, but contends that the runoff will nevertheless conform with existing drinking water purity requirements. Movants in turn dispute the Service's calculation of runoff purity levels, and argue that even if the runoff does conform with existing requirements it will be less pure than the existing water supply and will erode the margin of safety the City enjoys due to the present high quality of its water.

■ While case law offers little illumination, the threatened introduction of contaminants into drinking water, even if not in actual violation of applicable drinking water standards, is itself plainly significant. Requiring the Service to proceed with caution—that is, with the benefit of the fuller public discussion and input afforded by an EIS—makes abundant sense and fulfills NEPA's purposes of ensuring careful analysis of major federal projects and of "[e]ncourag[ing] and facilitat[ing] public involvement in decisions which affect the quality of the human environment." 40 C.F.R. § 1500.2(d). A finding that even marginal degradation of drinking water is environmentally significant is further supported by the regulatory definition of "significance," which finds relevant "the degree to which the proposed action affects public health or safety," 40 C.F.R. § 1508.27(b)(2), as well as the action's "proximity to ... ecologically critical areas," 40 C.F.R. § 1508.27(b)(3).

c) The EA does not assess the risk or likely effects of chemical spills at the facility, although it does include a "Best Management Practices" plan to minimize the risk of such spills. Again, while it is admirable that the Service has attempted to minimize such risks, the EA must additionally consider the magnitude and possible consequences of remaining risk.

d) The EA identifies four wetlands on the site, including "Wetland number 2," which is to be filled for construction of the facility and "replicated" by expansion of another wetland on the site. Movants object that the elimination of a wetland is inherently a significant environmental event, and that its "replication" will be partly or completely unsuccessful and in any case will not be complete for "many years." The EA outlines measures to ensure replication, and states as its goal to attain within three growing seasons "at least 75 percent of the surface of the replication area established with indigenous wetland plant species." Updated Wetland Impact Assessment Report, Oct. 31, 1990, at 30 (Appendix C to EA). That document projects that "the mitigation measures proposed for the ... project will ensure that the functions provided by the pre-development wetland areas are maintained under post-development conditions." *Id.* at 29.

Some courts have refused challenges to agency findings of no significant impact where mitigation measures compensated for damage to or elimination of wetlands. *See Sierra Club v. Alexander,* 484 F.Supp. 455 (N.D.N.Y.1980), *aff'd without opinion* 633 F.2d 206 (2d Cir.1980). Even if the elimination and attempted replication of the wetland is not deemed inherently significant, however, the EA's projection of the success of its wetland replication efforts is predicated on optimistic projections about uncertain events.

### 4. Other Shortcomings of the EA

Beyond these three major weaknesses in the Service's EA, it is inadequate in other respects.

For example, the EA acknowledges that the facility violates numerous zoning restrictions in the Towns of North Castle and Harrison, including those governing building height, lot coverage, floor area ratio, and buffer zone provision, but states that because "the building has been designed and landscaped to soften its visual impact," the violations "will not result in significant impacts." That amounts to putting a tutu on an elephant and calling it a ballerina. It is undisputed that the facility is of unprecedented magnitude for the Harrison area. While the result may be the same after an EIS has been filed, the intention of NEPA is to better inform agency decision-makers and to allow accommodations to be made as a result of completing the required study

and after the public's comments have been considered.

■ The inconsistency of a development with existing land uses in the relevant area or with zoning is a relevant environmental consideration under NEPA. *Cf. Hanly v. Mitchell*, 460 F.2d 640, 647 (2d Cir.), *cert. denied*, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) (reversing a FONSI and requiring consideration of factors that might affect human environment in the area including possible disturbances from the presence of a jail and drug treatment center in a residential neighborhood, and noting generally that "[t]he Act must be construed to include protection of the quality of life for city residents"). The project's incompatibility with zoning requirements is particularly relevant since the regulatory definition of "significant" includes as a relevant factor the proposed facility's violation of any other "Federal, State or local law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b)(10).

Taken as a whole, these shortcomings establish that the Service's finding of no significant impact was arbitrary and capricious.

### III.

■ The issue remains whether an injunction should be granted.

A preliminary injunction may be granted only if movants have shown that without such relief they will suffer possible irreparable harm, and either that they are likely to succeed on the merits or have raised serious questions going to the merits, and a balance of hardships tips decidedly in their favor. *Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1048 (2d Cir.1983), *cert. denied*, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984).

The Service argues that it represents the public interest and that in such circumstances, the movants must satisfy the "more stringent test" requiring a showing of likely success (citing *L.S.S. Leasing Corp. v. United States General Services Administration*, 579 F.Supp. 1565, 1569 (S.D.N.Y.1984), and *Union Carbide Agricultural Products Co. v. Costle*, 632 F.2d 1014, 1018 (2d Cir.1980) (district court erred in applying "less onerous" test), *cert. denied* 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981)).

However, in the case at hand the public interest is represented at least as much by the City of New York, Westchester County and the Town of Harrison, and the imperative to assure pure drinking water for eight million people trumps the convenience of better mail delivery to one million. In contrast, the cases on which the Service relies involved purely private challenges to federal action: *Union Carbide* concerned a takings clause challenge to application of a federal statute (the Federal Insecticide, Fungicide, and Rodenticide Act) in which there were no competing allegations that the movants represented the "public interest." *L.S.S. Leasing*, 579 F.Supp. 1565 (S.D.N.Y.1984), also involved a private plaintiff (a landlord which would lose federal tenants if the proposed federal office building in question were built) challenging a project authorized by Congress and likely to improve the efficiency of government operations.

In sum, the movants may be entitled to relief if they satisfy either branch of the preliminary injunction test. In fact, they have satisfied both branches.

As an initial matter, the movants have shown a real danger that they will suffer irreparable harm absent an immediate injunction. Construction is likely to begin promptly if injunctive relief is not granted.[6] Once begun, such work cannot be undone. That work may well result in actual environmental harm, which similarly cannot be undone. NEPA's statutory purpose is to ensure that federal actions occur only after the decision-makers have considered fully the environmental consequences of their

---

**6.** Indeed, the United States initially attempted to secure expedited briefing and argument of the motion at issue because it had received bids on the facility's construction and hoped to obtain judgment before those bids lapsed so that it could proceed.

actions. Regardless of the actual physical harm to the environment that may occur as a result, when an agency embarks on significant activity without adequately considering its environmental consequences "the harm that NEPA intends to prevent has been suffered." *Sierra Club v. Marsh,* 872 F.2d 497, 500 (1st Cir.1989).

Given the movants' showing of likely irreparable harm, we turn to the remainder of the preliminary injunction test, which, as noted above, requires a showing either of likely success on the merits or the existence of serious questions going to the merits combined with a balance of hardships tipping decidedly in the movants' favor.

The movants by identifying the EA's numerous inadequacies raise serious questions and establish likely success in proving that the Service's finding of no significant impact was arbitrary and capricious. Particularly where the continued quality of drinking water for eight million people is at stake, an agency planning action must proceed with caution. The stakes here are too high, the proposed facility too large, the issues too complex and the Service's analysis too questionable in critical parts to permit construction without the benefit of a more searching review that provides for full public discussion and input.

Finally, the balance of hardships here tips decidedly in the movants' favor. The injury to the eight million or more people whom they represent which might occur as a result of a failure to prepare an EIS, that is to say, possible contamination of drinking water, possible traffic tie-ups and dramatic physical changes in the area, clearly outweighs improvement in mail delivery to Westchester citizens, however useful that may be.

The motions for a preliminary injunction are granted, and the Postal Service's motion for summary judgment is denied.

It is so ordered.